United States District Court
Southern District of Texas
**ENTERED**
March 15, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BEN CHAPA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 6:21-CV-00015 |
| | § | |
| SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Ben Chapa brought this action on March 29, 2021, seeking review of the Commissioner's final decision determining he was not disabled. (D.E. 1).[1] On January 13, 2022, Plaintiff filed a Motion for Summary Judgment. (D.E. 28). On February 15, 2022, Defendant filed a Response, construed as a Cross Motion for Summary Judgment. (D.E. 29). For the reasons below, the undersigned **RECOMMENDS** the ALJ's decision is supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, the Commissioner's Motion for Summary Judgment be **GRANTED** and this case be **DISMISSED**.

---

[1] Plaintiff initially filed this case proceeding *pro se* and later obtained counsel in January 2022. (D.E. 1; D.E. 25 and D.E. 28).

1 / 34

## I.     JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).  This case has been referred to the undersigned pursuant to 28 U.S.C. § 636.

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The burden has been described as more than a scintilla but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citation omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  However, the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted); *Carey*, 230 F.3d at 135 ("Conflicts in the evidence are for the Commissioner to resolve.") (citation omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995) (citations omitted). The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step who must show that, in light of claimant's residual functional capacity ("RFC"), claimant can perform other substantial work in the national economy. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## III.   ISSUES PRESENTED

Plaintiff contends (1) the ALJ failed to properly consider all of his severe physical impairments at Step 2; (2) the ALJ's RFC determination is not based on substantial evidence; and (3) the ALJ erred at Step 5 when applying the Grid Rules[2] because he has a non-exertional limitation: headache pain.

---

[2]When the Commissioner decides at Step 5 that an applicant can perform available, alternative employment, that decision must be supported by substantial evidence. The Commissioner satisfies this burden either by receiving testimony from a vocational expert ("VE") or by taking administrative notice of the availability of alternative work by consulting the "Medical Vocational Guidelines," usually referred to as "the Grids." *Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir. 1999).

## IV.    PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits on February 26, 2018, alleging disability as of January 1, 2018, due to a brain tumor.  (D.E. 13-3, Page 11 and D.E. 13-4, Pages 2-3).   After Plaintiff's applications were denied initially in October 2018 and upon reconsideration in May 2018, at Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on June 25, 2019, at which Plaintiff, who was represented by counsel, and a VE testified.  (D.E. 13-3, Pages 23-46; D.E. 13-4; D.E. 13-5, Pages 16-17).  The ALJ issued an unfavorable decision on September 26, 2019, finding Plaintiff not disabled.  (D.E. 13-3, Page 17).

The Appeals Council declined Plaintiff's request for review on January 20, 2021, making the ALJ's September 26, 2019 decision final.  (D.E. 13-3, Pages 2-3).  Plaintiff then filed this action on March 29, 2021, seeking review of the Commissioner's final decision.  (D.E. 1).

## V.    RECORD SUMMARY[3]

On November 7, 2014, a head CT without contrast showed a 2.5 cm x 2.6 cm x 6 mm subgaleal soft tissue mass.  (D.E. 13-8, Page 6).  The impression was a "chronic benign soft tissue mass with erosive change, infectious process, or neoplastic infiltration.  Question whether patient has history of leukemia or lymphoma.  Recommend either percutaneous biopsy or MRI with contrast for further anatomic evaluation."  (D.E. 13-8, Page 7).

---

[3]The undersigned has reviewed the entire record and includes in this summary the records related to the parties' arguments.

A brain MRI with and without contrast on January 12, 2015 showed a 2.5 cm x 2.4 cm x .9 cm subgaleal soft tissue mass "similar to the head CT 11/07/2014." (D.E. 13-8, Page 4). The impression was that the "lesion is most likely benign given bony remodeling and lack of bone marrow edema. This mass appears subgaleal rather than subcutaneous, and most likely represents a hemangioma. Dermal mass lesions are possible but considered less likely. No acute intracranial abnormality." (D.E. 13-8, Pages 16-17).

Plaintiff was treated by Dr. Andrew Kessler, a psychiatrist, while incarcerated on April 1 and April 22, 2015. (D.E. 13-11, Pages 17 and 21-22). Dr. Kessler opined that Plaintiff's "thought content is centered on concerns regarding his head mass. He asks me questions which it seems other people have already answered. There is a certain irony in this patient's newfound concern for his head mass. He was hit on the head with a baseball bat 30 years ago which started the slow process of the mass appearing and becoming larger in size. Yet he ignored the issue of his head mass. Now that he is in prison he has a new found concern that is genuine but over shoots the mark." (D.E. 13-11, Page 17).

Imaging on May 5, 2015 of Plaintiff's cervical spine and neck showed "[m]ild degenerative changes of the cervical spine." (D.E. 13-11, Page 64).

On May 20, 2015, Plaintiff was treated by Dr. Jerry Davis. (D.E. 13-8, Page 52). Plaintiff is noted as having a "right parietal lesion that is causing him pain." (D.E. 13-8, Page 52). Plaintiff stated he had been aware of the lesion for several years and related it to "an incident when he was a teenager in which he was struck in the head." (D.E. 13-8, Page 52). Plaintiff reported having headaches and "a full feeling in his head." (D.E. 13-8, Page

52).  Dr. Davis noted that "[s]ome of the other symptoms are more difficult to relate to a skull lesion such as vision problems and a simple feeling of being out of it."  (D.E. 13-8, Page 52).  Plaintiff was advised to schedule a follow-up visit and to bring his medical records, including CT and MRI findings.  (D.E. 13-8, Page 52).

Plaintiff was again treated by Dr. Davis on June 2, 2015.  (D.E. 13-8, Page 52).  Dr. Davis noted the head CT and brain MRI showed a "midline vertex scalp lesion."  (D.E. 13-8, Page 52).  He further noted he needed additional information before making a surgical recommendation and "[i]t was clearly explained to [Plaintiff] multiple times today that this lesion would be causing localized pain, but no other symptoms.  Anything else with which he complains would be related to other conditions.  I am only going to be addressing this scalp lesion."  (D.E. 13-8, Page 52).

On June 26, 2015, after ordering and receiving further imaging, Dr. Davis again treated Plaintiff.  (D.E. 13-8, Pages 53 and 57).  Dr. Davis opined Plaintiff had two options: (1) a "watchful" approach with a follow-up MRI in six months or (2) an "aggressive" approach with an immediate surgery removing the scalp lesion and the affected underlying bone and then the placement of a titanium mesh plate to correct the defect within the skull with the "biggest risk [being] to the superior sagittal sinus."  (D.E. 13-8, Page 53).  Plaintiff advised he would contact Dr. Davis with his decision, ultimately deciding on a "watchful" approach.  (D.E. 13-8, Pages 53 and 54).

An August 7, 2015 MRI with and without contrast showed a "2 cm right parietal calvarial lesion" and an "[o]therwise unremarkable MRI of the brain without significant

intracranial findings." (D.E. 13-8, Page 42). It is noted as "believed to benign" and that "the surgeon advises either immediate excision or a [follow-up] MRI in 6 months." (D.E. 13-8, Page 41).

Plaintiff was again treated by Dr. Davis on August 12, 2015, for a "mass within the scalp and invading the skull at the vertex." (D.E. 13-8, Page 54). Dr. Davis determined the August 7, 2015 MRI "does show some increase in size of the mass but this is not dramatic. It has certainly not doubled in size." (D.E. 13-8, Page 54). Dr. Davis again noted Plaintiff's two options, stating "I have recommended removal for pathology but also to simply be done with this lesion. Once it is out, he no longer needs to worry with it. I did again briefly mention the surgical procedure and the risk to the sagittal sinus, this being the primary issue with this surgery. He understands a titanium mesh plate will be used to reconstruct the defect within the skull." (D.E. 13-8, Page 54). Plaintiff elected to continue without surgery and was scheduled for a follow-up in three months. (D.E. 13-8, Page 54).

On November 10, 2015, Plaintiff was again treated by Dr. Davis who noted Plaintiff's condition would be followed "nonoperatively" and a brain MRI would be ordered. (D.E. 13-8, Page 54). Dr. Davis noted that Plaintiff reported "pain at the vertex of his scalp which is likely referenced to this lesion. He knows that at any time he can reverse course and decide to proceed with an operation." (D.E. 13-8, Page 54). A follow-up was scheduled. (D.E. 13-8, Page 54).

A February 12, 2016 brain MRI with and without contrast found "mild interval enlargement of the right parietal lesion and progression of invasion through the calvarium

to the dural level." (D.E. 13-8, Pages 43-44).  A follow up head CT was recommended.
(D.E. 13-8, Page 44).  It is noted as a possible hemangioma or an atypical meningioma.
(D.E. 13-8, Page 44).

On February 23, 2016, Plaintiff was again treated by Dr. Davis who noted that
Plaintiff had a "stable skull lesion at the vertex" that "has not changed in shape or
appearance since the first MRI a year ago." (D.E. 13-8, Page 55).  Dr. Davis further noted
that "[w]hile it is causing him pain, the ability to demonstrate its lack of growth means it
does not require removal at this time.  He does have issues with visual disturbances,
dizziness, pressure at the base of his head that are not related to this lesion." (D.E. 13-8,
Page 55).  Dr. Davis opined that the lesion did not require removal as it had not shown any
growth and "[f]urther evaluation would occur only if he feels the lesion is growing." (D.E.
13-8, Page 55).

In January 2017, Dr. Davis was contacted by the correctional institution having
custody of Plaintiff regarding further treatment.  (D.E. 13-8, Pages 55-56).  Dr. Davis
opined that Plaintiff has a stable skull lesion at the vertex that has not changed in shape or
appearance.  (D.E. 13-8, Page 56).  He further opined that Plaintiff's "black outs and
dizziness are not symptoms of the lesion" as "the only symptom that would arise from the
skull lesion would be head pain." (D.E. 13-8, Page 56).  Dr. Davis declined to order an
additional CT.  (D.E. 13-8, Page 56).

A February 3, 2017 head CT with and without contrast showed no changes in the lesion.  (D.E. 13-8, Page 58).  The overall impression was "[s]table right superior parietal scalp abnormality" and "[o]therwise normal exam of the brain."  (D.E. 13-8, Page 58).

Plaintiff was treated by Dr. Darnell Josiah on June 9, 2017 for a neurosurgery consultation.  (D.E. 13-8, Pages 59-63).  Plaintiff is noted as having "complaints of right-sided heart pain and headache which was up to his head and goes back to the neck.  He also complains of left-sided eye pain and sometimes numbness…[and] headaches are daily."  (D.E. 13-8, Page 61).  Plaintiff reported he was hit on the top of his head with a pipe when he was 15 years old that did not initially cause issues but was causing a bump on his head, which he believe was getting larger especially when he was laying down.  (D.E. 13-8, Page 61).  Dr. Josiah noted imaging showed the lesion did increase when Plaintiff was lying down.  (D.E. 13-8, Page 62).  Dr. Josiah opined that "[t]his lesion will not cause the patient's headaches.  The natural history of such lesions are very benign.  At this point, there is no need for neurosurgical interventions given the high risks of the procedure…"  (D.E. 13-8, Page 62).  Dr. Josiah recommended a neurology consultation for Plaintiff's headaches as well as a cardiology consultation as Plaintiff complained of dizziness when standing up.  (D.E. 13-8, Page 62).

On February 26, 2018, Plaintiff was treated at Cuero Regional Hospital for headaches and abdominal pain.  (D.E. 13-14, Pages 3 and 10).  Plaintiff reported he was released from incarceration two weeks prior and did not yet have a primary care physician to prescribe needed medication.  (D.E. 13-14, Page 10).  Plaintiff reported he had a brain

tumor.  (D.E. 13-14, Page 10).  A head CT with contrast showed no abnormalities.  (D.E. 13-13, Pages 48-49 and D.E. 13-14, Pages 13 and 17).  Plaintiff was instructed to find and establish himself with a primary care physician and was prescribed milk of magnesia, Dulcolax and hydrocodone/acetaminophen.  (D.E. 13-14, Pages 13 and 20).  The same day, Plaintiff filed an application for benefits, alleging disability as of January 1, 2018, due to a brain tumor.  (D.E. 13-3, Page 11 and D.E. 13-4, Pages 2-3).

Plaintiff completed a function report on March 22, 2018, reporting a brain tumor caused him to have headaches, pain and vision issues, making it difficult to perform normal activities.  (D.E. 13-7, Page 5).  Plaintiff reported that during a typical day, he sits and watches television "all day long," eats once or twice, showers and goes back to sleep.  (D.E. 13-7, Pages 6 and 9).  Plaintiff also reported he prepares his own meals and helps his mother with cleaning the house once or twice a week.  (D.E. 13-7, Page 7).  Plaintiff further reported he does not drive, grocery shops, can handle his own money and can no longer draw because of vision issues.  (D.E. 13-7, Pages 7-9).

Plaintiff was treated in the emergency room on April 11 and 12, 2018 with complaints of headaches.  (D.E. 13-13, Pages 10-24).  Plaintiff reported chronic headaches worsening when lying flat, feeling dizzy and having vision and balance issues.  (D.E. 13-13, Page 12).  While Plaintiff reported having a brain tumor, the treating physician noted a "CT scan reveals only small right posterior scalp hematoma."  (D.E. 13-13, Page 12).  The impression on the CT was a "[s]mall right posterior scalp hematoma with central hyperdensity which may represent active extravasation of contrast" with "[n]o intracranial

mass lesion, hemorrhage, or infraction." (D.E. 13-13, Page 23). Chest x-rays revealed no evidence of acute cardiopulmonary disease. (D.E. 13-13, Page 24). Plaintiff was discharged and advised to follow up with neurosurgery. (D.E. 13-13, Page 12).

On May 14, 2018, Plaintiff's application for benefits was initially denied. (D.E. 13-4, Pages 2-11). State agency medical consultant Dr. Patty Rowley opined that Plaintiff did not have a severe impairment and a consultative examination was not needed. (D.E. 13-4, Pages 5-7).

A May 16, 2018 brain MRI without and without contrast showed a subgaleal hematoma measuring up to 6mm at the right high posterior frontal scalp. (D.E. 13-13, Page 25). The overall impression was "[n]o acute intracranial pathology or abnormal enhancement," "[m]ild chronic microvascular ischemic disease" and "[r]esolving subgaleal hematoma measuring up to 6mm at the right high posterior frontal scalp." (D.E. 13-13, Pages 25-26).

Plaintiff was treated by Dr. Asif Maknojia and Dr. Erick Garcia on May 18, 2018 and June 8 and June 22, 2018 for complaints of throbbing and pressure headaches. (D.E. 13-13, Pages 4-9). Dr. Garcia prescribed Tylenol #3 and referred Plaintiff to neurology. (D.E. 13-13, Page 4).

On August 6, 2018, Plaintiff was treated at Parkside Family Clinic for headaches. (D.E. 13-13, Page 34). Plaintiff reported daily headaches and associated symptoms including nausea, vomiting and dizziness. (D.E. 13-13, Page 34). Plaintiff again reported he had a brain tumor. (D.E. 13-13, Page 34). Plaintiff further reported he moved to Texas

after being released from prison in Wisconsin four months prior "to help care for his aging parents." (D.E. 13-13, Page 34). Plaintiff also reported he was "trying to get disability due to the headaches and dizziness" and that he was trying to qualify for Medicaid to be able to remove his brain tumor. (D.E. 13-13, Page 34). Plaintiff was prescribed Tylenol #2 and a muscle relaxer. (D.E. 13-13, Page 36).

On August 8, 2018, Nurse Practitioner Melinda Fitz of the Parkside Family Clinic completed a check the box form, opining that Plaintiff "is unable to work, or participate in activities to prepare for work at all" and [t]he disability is not permanent and is expected to last more than 6 months." (D.E. 13-12, Page 38). Nurse Fitz attributed Plaintiff's "disabling diagnosis" to "right parietal lobe lesion" and "vertigo" but she did not find any activity restrictions. (D.E. 13-12, Pages 38-39).

On August 21, 2018, Plaintiff was treated at Parkside Family Clinic for Hepatitis C and a headache. (D.E. 13-13, Page 31). Plaintiff reported headaches, dizziness, visual changes and weakness in his extremities. (D.E. 13-13, Page 31). Plaintiff's prescription for a muscle relaxer was continued, a migraine medicine was added and he was told to follow up. (D.E. 13-13, Page 32).

On August 24, 2018, Plaintiff was treated by neurosurgeon Dr. David Wallace. (D.E. 13-13, Pages 2- 3). Plaintiff reported being hit with a lead pipe as a child and complained of headaches and dizziness. (D.E. 13-3, Page 2). Dr. Wallace opined Plaintiff's headaches and dizziness appear to be a venous lake (elevated lesion) that could be treated with a "small surgical procedure with cranioplasty and a repair" but that it was

a "non-urgent procedure." (D.E. 13-13, Page 2). Dr. Wallace noted Plaintiff "is still applying for disability and would like to inquire about obtaining that from our disability support paper (sic) from our clinic." (D.E. 13-13, Page 2). Dr. Wallace further noted "Mr. Chapa asked if I could fill out disability paperwork for him. I declined. I explained that while his headaches may be related to [his lesion], I do not think they prohibit him from working and other types of non-dangerous employment other than carpentry, his original trade." (D.E. 13-13, Page 2).

Plaintiff was again treated at Parkside Family Clinic on September 5, 2018 for Hepatitis C and headaches. (D.E. 13-13, Pages 28-30 and 37). Plaintiff reported he had applied for disability and Medicaid but had "not yet been approved" and could not afford to see a neurologist. (D.E. 13-13, Page 28). Plaintiff reported having headaches and dizziness with the migraine medication providing "good relief." (D.E. 13-13, Page 28). Plaintiff also reported unsteadiness at times as well as visual changes and weakness in his extremities. (D.E. 13-13, Page 28). Plaintiff's migraine medication prescription was continued as was his prescription for Tylenol #2. (D.E. 13-13, Page 29).

Plaintiff completed a function report on September 17, 2018, again reporting his headaches and stating he could lift 25 pounds infrequently, had pain in his neck and shoulders, could sit for about an hour, stand or walk for about 15 minutes without dizziness and his pain was worse when laying down. (D.E. 13-7, Pages 47-48 and 52). Plaintiff again reported he prepared his own meals or his family would and he performed household chores, including dishes and laundry. (D.E. 13-7, Page 49). Plaintiff reported he drove to

the store if his mother was too sick to do so and he also visited his doctors and parole officer.  (D.E. 13-7, Page 50).  Plaintiff again reported he was no longer able to draw and that he was having problems getting along with his mother because "she wants me to get my own place to live and pay my own bills."  (D.E. 13-7, Page 52).

On October 9, 2018, Plaintiff was again treated at Parkside Family Clinic for headaches and also abdominal pain.  (D.E. 13-15, Page 53).  Plaintiff reported he needed additional pain medication and his headaches were constant and worsening.  (D.E. 13-15, Page 53).  Plaintiff's prescription for Tylenol #2 was continued and it was noted that Plaintiff "is currently trying to get disability, then he will be able to get insurance, needing to see neurosurgeon in San Antonio for further workup for brain lesion."  (D.E. 13-15, Page 54).  A renal ultrasound was normal on October 10, 2018.   (D.E. 13-13, Page 45).

On October 12, 2018, Plaintiff's application for benefits was denied upon reconsideration.  (D.E. 13-4, Pages 12-21).  State agency medical consultant Dr. James Wright agreed with Dr. Rowley's conclusion, opining Plaintiff did not have a severe impairment and a consultative examination was not needed.  (D.E. 13-4, Pages 17-20).

On November 28, 2018, Plaintiff was again treated at Parkside Family Clinic for headaches and abdominal pain.  (D.E. 13-15, Page 50).  Plaintiff reported his symptoms occurred constantly and he needed a pain medication refill.  (D.E. 13-15, Page 50).  Plaintiff's Tylenol #2 and migraine medication prescriptions were continued and Plaintiff was started on amoxicillin and given an antibiotic injection.  (D.E. 13-15, Page 51).  It was again noted that Plaintiff "is currently trying to get disability, then he will be able to get

insurance, needing to see neurosurgeon in San Antonio for further workup for brain lesion."
(D.E. 13-15, Page 51).

Plaintiff was next treated on December 19, 2018 at Parkside Family Clinic for abdominal pain and headaches. (D.E. 13-15, Page 47). Plaintiff reported his headaches were constant and he needed a refill on pain medication. (D.E. 13-15, Page 47). It is noted that it is "[t]oo early to refill" Plaintiff's pain medication. (D.E. 13-15, Page 48). Plaintiff was advised to monitor and record his blood pressure daily and was referred to a surgical specialist. (D.E. 13-15, Page 48).

On December 28, 2018, Plaintiff was again treated at Parkside Family Clinic. (D.E. 13-15, Page 45). Plaintiff reported he had not taken his blood pressure medication for three days and he had a severe headache. (D.E. 13-15, Page 45). Plaintiff's prescriptions were continued and Plaintiff was referred to the emergency department at Cuero Regional Hospital for a "work up and management" given Plaintiff's worsening headache and blood pressure. (D.E. 13-15, Page 46). Plaintiff was treated the same day at Cuero Regional Hospital. (D.E. 13-14, Page 41). A head CT without contrast showed no acute intracranial findings and a soft tissue lesion within the scalp in the right posterior high parietal region. (D.E. 13-13, Pages 46-47 and D.E. 13-14, Page 45). Plaintiff was prescribed Tylenol #3 as needed for headaches. (D.E. 13-14, Page 43).

Plaintiff was again treated at Cuero Regional Hospital on January 23, 2019 for abdominal pain and on January 30, 2019 for a hernia repair. (D.E. 13-14, Pages 52-55). On February 1, 2019, Plaintiff was treated for severe abdominal pain and cramping post-

surgery.  (D.E. 13-15, Pages 2 and 9-35).  Plaintiff was advised to avoid hydrocodone until he had a bowel movement and was prescribed over the counter stool softeners.  (D.E. 13-15, Page 18).  The next day Plaintiff was treated at Parkside Family Clinic for headaches. (D.E. 13-15, Page 43).  Plaintiff reported he had "not been taking his blood pressure medication because he feels it makes his head worse."  (D.E. 13-15, Page 43).  Plaintiff further reported the swelling in his head had decreased since he stopped taking the medication and "he does not feel bad." (D.E. 13-15, Page 43).  Plaintiff's prescription for Tylenol #2 was continued and he was started on a beta blocker.  (D.E. 13-15, Page 44). Plaintiff was further advised to monitor and record his blood pressure on a daily basis and was also advised of the risks associated with uncontrolled blood pressure.  (D.E. 13-15, Page 44).

On February 26, 2019, Plaintiff was treated at Parkside Family Clinic for abdominal pain and a headache and other symptoms including nausea, cognitive impairments, fatigue and neck stiffness.  (D.E. 13-15, Page 40).  Plaintiff reported he had not been taking his blood pressure medication regularly "because he feels it makes his head worse and he feels fine.  Reports headaches are due to the mass in his head." (D.E. 13-15, Page 40).  Plaintiff's prescription for Tylenol #2 was continued and Plaintiff was again advised to monitor his blood pressure daily and record the findings.  (D.E. 13-15, Page 41).

Plaintiff was treated on March 27, 2019 at Cuero Regional Hospital for blood in his urine and kidney stones.  (D.E. 13-16, Pages 3-10).  The next week, on April 2, 2019, Plaintiff was treated at Parkside Family Clinic for headaches and abdominal pain.  (D.E.

13-16, Page 38).  Plaintiff reported headaches, nausea, cognitive impairments, fatigue and neck stiffness occurring two times a week as well as dizziness.  (D.E. 13-16, Page 38). Plaintiff reported he was taking his blood pressure medication as prescribed and it was noted that he has a "disability hearing in June."  (D.E. 13-16, Page 38).  Plaintiff also reported that "he was lifting a heavy wheelchair before he should have [after his hernia surgery] and it caused him to have blood in his urine."  (D.E. 13-16, Page 38).  Plaintiff was prescribed Tylenol #3, a muscle relaxer and he received an anti-inflammatory injection. (D.E. 13-16, Page 39).  Plaintiff was again advised to monitor his blood pressure daily and record the findings.  (D.E. 13-16, Page 39).

Plaintiff was again treated at Cuero Regional Hospital on May 1, 2019 for "body pain," specifically a "sudden onset of severe left flank pain that has been unrelenting." (D.E. 13-16, Pages 10-11).  Plaintiff was found to have "[m]ild left hydronephrosis and hydroureter to the level of a 3 mm left UVJ stone" and a "[t]iny left renal stone."  (D.E. 13-16, Page 28).  Plaintiff was given fluids and prescribed Flomax, an anti-inflammatory medication and Tylenol #3 and advised to follow up if there was no resolution within 24 hours.  (D.E. 13-16, Page 16).  Plaintiff was treated the next day at Parkside Family Clinic for a headache.  (D.E. 13-16, Page 36).  Plaintiff again reported a headache, nausea, cognitive impairments, fatigue and neck stiffness with "episodes occur[ring] 2 time(s) a week."  (D.E. 13-16, Page 36).  It was again noted that Plaintiff "has a disability hearing in June" and that Plaintiff needed a refill on his medications.  (D.E. 13-16, Page 36).

Plaintiff was prescribed Tylenol #3 and again advised to monitor and record his blood pressure. (D.E. 13-16, Page 37).

At the June 25, 2019 hearing, Plaintiff testified that while he was incarcerated he was diagnosed with a tumor in his brain. (D.E. 13-3, Page 26). Plaintiff stated that when he was arrested, he thought he had a hangover but after it did not go away after a week, he was taken to the hospital and the mass was discovered. (D.E. 13-3, Pages 26-27). Plaintiff further testified he feels constant pressure on his temple and has headaches once or twice a month lasting three to five days which make him uncomfortable sitting and laying down. (D.E. 13-3, Pages 27-29 and 31). Plaintiff also testified that when he has headaches, his mother will cook for him but he also cooks for himself. (D.E. 13-3, Page 30). Plaintiff stated he could read a newspaper and watch television but that reading or watching for a long periods causes headaches as do bright lights. (D.E. 13-3, Pages 31-33). Plaintiff also testified that on an average day without a headache, he could stand at most for 15 to 20 minutes before getting dizzy and that he is in pain throughout the day. (D.E. 13-3, Pages 33 and 35). Plaintiff also testified that he assists mother as well as his father, who was recently released from a nursing home and is in a wheelchair, and he does his own laundry and grocery shops. (D.E. 13-3, Pages 35-37). Plaintiff further stated that while incarcerated, he frequently lifted weights and could currently lift 60 to 70 pounds. (D.E. 13-3, Page 37).[4] When questioned about his lack of work history and reported earnings,

---

[4]Treatment records from the Wisconsin Department of Corrections, where Plaintiff was incarcerated from 2014 and 2018, indicate Plaintiff insisted on "vigorous workouts" in 2017 and 2018 consisting of 100 push-ups, 100 sit-ups, weight lifting, squats and walking the track despite his ailments including headaches and dizziness. (D.E. 13-9, Pages 27-28 and 30). Beginning in 2015, Plaintiff consistently complained of headaches and was treated for kidney stones

Plaintiff testified he was a carpenter who worked on his neighbors' and father's home replacing roofing, doors and siding which "kept money in [his] pocket" and that he had been in and out of incarceration for several years at a time from 2000 to 2004 and 2014 to 2018. (D.E. 13-3, Pages 40-41 and D.E. 13-6, Pages 8-18).

On September 26, 2019, the ALJ determined Plaintiff had not engaged in substantial gainful activity since February 26, 2018 and that he had one severe impairment: headaches. (D.E. 13-3, Page 13). The ALJ then determined Plaintiff did not have an impairment or combination of impairments the meets or medically equaled the severity of one of the listed impairments. (D.E. 13-3, Page 13). The ALJ next found Plaintiff has the RFC to perform a full range of light work. (D.E. 13-3, Page 14). Analyzing Plaintiff's hearing testimony, the ALJ held that while Plaintiff's headaches "could reasonably be expected to cause the alleged symptoms…[his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…" (D.E. 13-3, Page 14). Reviewing Plaintiff's medical history stating Plaintiff's headaches "could have more than a minimal effect on his ability to perform basic work-related activities," the ALJ found Plaintiff's "complaints of significant and debilitating headaches are not persuasive," "recogniz[ing] that the [Plaintiff's] headaches, even if not disabling, do cause some type of limitations in his ability to function." (D.E. 13-3, Pages 15-16). The ALJ then limited Plaintiff to light work. (D.E. 13-3, Page 15). The ALJ next held Plaintiff, at the time a younger individual at age 49

---

while incarcerated. (D.E. 13-9 and D.E. 13-10). He also received continuous substance abuse treatment. (D.E. 13-12).

with no past relevant work and a high school education, could perform jobs that exist in significant numbers in the national economy pursuant to the Grid Rules and he was therefore, not disabled.  (D.E. 13-3, Pages 16-17).

## VI.  ANALYSIS

### A.  Step Two

Plaintiff first contends the ALJ failed to properly consider all impairments, both severe and non-severe at Step Two, when determining his ability to perform work-related activities, specifically his kidney stones, hernia, degenerative changes to his spine, dizziness, Hepatitis C and high blood pressure.  (D.E. 28, Pages 11 and 13).

The undersigned first notes that Plaintiff did not identify these impairments as disabling when he applied for benefits on February 26, 2018, alleging disability as of January 1, 2018.  (D.E. 13-3, Page 11; D.E. 13-4, Pages 2-3 and D.E. 13-7, Page 14).  When asked to list "all of the physical or mental conditions that limit your ability to work," Plaintiff listed solely "brain tumor."  (D.E. 13-7, Page 14).  Further, having reviewed the record and the ALJ's opinion, the ALJ properly applied the *Stone* standard.  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (An "impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.")  In *Stone*, the Fifth Circuit stated ALJs must not only use the stated standard, they must also cite to it in their written decisions or a presumption arises that the wrong severity standard was used.  *Id*. at 1106.  However, the Fifth Circuit

later clarified that a case should not be remanded simply because the *Stone* case is not cited by name. *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021) ("Remand is only appropriate 'where there is no indication the ALJ applied the correct standard.'") (citation omitted). In *Keel*, the Fifth Circuit found that while the ALJ did not mention the *Stone* standard, the ALJ did cite Social Security Ruling ("SSR") 85-28, which uses the same standard as *Stone*. *Id*. ("Though the precise wording differs, *Stone* and SSR 85-28 are not substantially different enough to warrant a finding of error" as SSR 85-28 comports with *Stone*). Further, the Fifth Circuit determined that if the ALJ proceeds past Step Two, any failure to properly apply the *Stone* standard is harmless error if "it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err." *Id*. (Rejecting Plaintiff's argument that the ALJ failed to consider both her severe and non-severe impairments in combination and finding harmless error) (citation omitted).

Here, as in *Keel*, the ALJ did not specifically refer to *Stone* at Step Two but did refer to SSR 85-28. (D.E. 13-3, Page 13). Plaintiff argues the ALJ failed to consider all of his impairments both singly and in combination with his other impairments and it was not harmless error. However, Plaintiff "does not meaningfully address how the ALJ's application of SSR 85-28 (instead of citing *Stone*) produced a different outcome in [his] case." *Keel*, 986 F.3d at 557. The record demonstrates the ALJ considered the record and found only one severe impairment: headaches. *Id*. (The burden of showing an error is harmful normally falls upon the party attacking the agency's determination) (citation omitted). While Plaintiff cites to portions of the record indicating Plaintiff has been treated

21 / 34

for kidney stones, Hepatitis C, dizziness, mild spine degeneration and hypertension, "[t]he mere presence of some impairment is not disabling per se.  Plaintiff must show that [he] was so functionally impaired by [his][disability] that [he] was precluded from engaging in any substantial gainful activity."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citation omitted) (An individual claiming disability has the burden of proving disability). Plaintiff has failed to show he was so functionally impaired by these additional ailments that he is precluded from engaging in substantial gainful activity.  *Id.*; 20 C.F.R. §§ 416.920(c) and 416.921(a) (A severe impairment is an one which significantly limits a claimant's physical or mental abilities to do basic work activities).

As to Plaintiff's spine degeneration, the only record cited to by Plaintiff is imaging on May 5, 2015 of Plaintiff's cervical spine and neck which showed only "[m]ild degenerative changes of the cervical spine."  (D.E. 13-11, Page 64).  Plaintiff cites to no other medical records indicating Plaintiff's neck or back could otherwise be considered a severe impairment.  Further, as to all of Plaintiff's additional ailments, while Plaintiff was incarcerated in 2017 and 2018 and had complained of headaches, dizziness, kidney stones and Hepatitis C, he also insisted on "vigorous workouts" including 100 push-ups, 100 sit-ups, squats, weight lifting and walking the track.  (D.E. 13-9, Pages 27-28 and 30 and D.E. 13-10).  Additionally, on August 24, 2018, Plaintiff's treating physician Dr. Wallace declined to complete disability paperwork for Plaintiff when asked because, in his opinion, Plaintiff's dizziness and headaches did not restrict him from working as something other than a carpenter.  (D.E. 13-13, Page 2).  On September 5, 2018, Plaintiff reported having

headaches and dizziness with his migraine medication providing "good relief." (D.E. 13-13, Page 28); *James v. Bowen*, 793 F.2d 702 (5th Cir. 1986) (citation omitted) (Impairments controlled by medication are not disabling); *Garcia v. Astrue*, 293 F. App'x 243, 245 (5th Cir. 2008) (Claimant was not disabled where the record showed medication controlled claimant's migraine headaches even though the ALJ determined claimant's headaches were a severe impairment).   Plaintiff's hernia was repaired with surgery on January 30, 2019 and there is no indication in the record this repair was unsuccessful, although Plaintiff admitted on April 2, 2019 that "he was lifting a heavy wheelchair before he should have [after his hernia surgery] and it caused him to have blood in his urine." (D.E. 13-14, Pages 52-55 and D.E. 13-16, Page 38).  There is no indication in the record that Plaintiff's blood pressure was uncontrolled by medication, only that Plaintiff was cautioned to take his medication and to take his blood pressure daily and record it.   Additionally, a renal ultrasound was normal on October 10, 2018 and after treatment for small kidney stones on May 1, 2019, Plaintiff has provided no records indicating he had any further difficulty. (D.E. 13-13, Page 45 and D.E. 13-16, Pages 10-11, 16 and 28).  Further, two state agency medical consultants reviewed the record and determined Plaintiff had no severe impairments.  (D.E. 13-4, Pages 5-7 and 17-20).

Additionally, the record consistently shows Plaintiff engaged in numerous activities of daily living, including cooking, cleaning, doing laundry, shopping for groceries, watching tv, paying bills, reading and helping to care of his elderly parents, one of whom is in a wheelchair. (D.E. 13-3, Pages 30-37; D.E. 13-6, Page 38; D.E. 13-13, Page 34; D.E.

13-17, Pages 5-9 and 50); *Leggett v. Chater*, 67 F.3d 558, 565 n. 12 (5th Cir. 1995) (The Court should consider whether Plaintiff's reported daily activities support alleged activity restrictions).

Additionally, while Plaintiff cites to his own testimony regarding the severity of his additional impairments, as found by the ALJ, Plaintiff's testimony regarding his exertional limitations is not consistent with the record, as discussed above. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (Subjective complaints must be corroborated, at least in part, by objective medical findings) (citations omitted)

Throughout the entire opinion, which proceeded beyond Step Two, the ALJ considered all of Plaintiff's impairments, singly and in combination, when determining Plaintiff's RFC and substantial evidence supports the decision that Plaintiff's ailments, other than headaches, were not severe and none precluded him from working. (D.E. 13-3, Page 15). Accordingly, even if the *Stone* standard had been improperly applied, the same administrative conclusion would have been reached. *Keel*, 986 F.3d at 556. Therefore, the undersigned recommends Plaintiff's first argument is without merit.

### B.    RFC Determination

Plaintiff next asserts that the ALJ's RFC determination that Plaintiff can perform light work is not supported by any medical evidence and the ALJ should have ordered a consultative examination to determine his functional limitations because the extent of

Plaintiff's pain is not clear from the medical records.  (D.E. 28, Pages 15-16).  For the reasons stated below, the undersigned recommends this argument is also without merit.

An RFC is an assessment, based on all relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments.  20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) ("RFC involves both exertional and non-exertional factors.")  RFC refers to the most a claimant is able to do despite physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence.  The ALJ is not required to incorporate limitations in the RFC that are not supported in the record.  *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.") (citation omitted).  Here, the ALJ summarized and analyzed Plaintiff's conditions, including any subjective complaints and the objective medical evidence, finding Plaintiff had a severe impairment, headaches, but no impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  After finding Plaintiff had no past relevant work, the ALJ determined Plaintiff had the RFC to perform a light work, taking into account Plaintiff's impairments.

The Fifth Circuit has held the absence of a medical source statement about a plaintiff's ability to work does not, by itself, make the record incomplete.  *Ripley v. Charter*, 67 F.3d 552, 557 (5th Cir. 1995).  Instead, the issue is whether substantial

evidence exists in the record to support the ALJ's decision.  *Id.*  "The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citation omitted).  "Generally, however, the duty to obtain medical records is on the claimant."  *Gonzalez v. Barnhart*, 51 Fed. App'x 484 (5th Cir. 2002) (the ALJ, who made numerous inquiries regarding [claimant's] medical condition and employment history, did not fail to develop the record by not ordering a consultative examination and a consultative examination was not necessary to enable the ALJ to make a disability determination).

In this case, Plaintiff points to no evidence that he requested a consultative examination at any point during the claims process.  Further, Plaintiff's counsel did not request a consultative examination or any expert testimony at the administrative hearing.  Upon review, the ALJ's determination of Plaintiff's RFC is based on substantial evidence even without such a medical opinion.  The ALJ properly evaluated Plaintiff's impairments and the completeness of the record before determining Plaintiff's RFC.  All of Plaintiff's ailments and resulting limitations are discussed throughout Plaintiff's treatment records.  The ALJ, who questioned the Plaintiff at length, observed him during the hearing, and reviewed his treatment records, was not required to order a consultative examination or additional medical testimony in order to make a disability determination.  The ALJ based his determination in part on Plaintiff's own reports and testimony regarding his ability to perform certain tasks despite having claims of physical limitations, including pain.  The ALJ possessed evidence to fully and fairly develop the record, noting the inconsistencies

between Plaintiff's testimony and the other evidence in the record. Further, the undersigned notes no physician who examined Plaintiff opined he was disabled. *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (citations omitted). Rather, the ALJ's determination is consistent with that of Plaintiff's treating physician's opinion, Dr. Wallace, who opined Plaintiff's dizziness and headaches did not restrict him from working as something other than a carpenter. (D.E. 13-13, Page 2). The ALJ expressly considered this opinion, finding Plaintiff's RFC allowed him to perform "a significant number of jobs in the national economy…even if one excluded dangerous work as suggested by Dr. Wallace." (D.E. 13-3, Page 15). Further, two state agency medical consultants reviewed the record and determined Plaintiff had no severe impairments that would impair his ability to work. (D.E. 13-4, Pages 5-7 and 17-20). Regarding these opinions, the ALJ stated, "While I do not disagree with this finding, in order to give the claimant's testimony the widest latitude possible, I have found that the claimant has a severe impairment (headaches) that could have more than a minimal effect on his ability to perform basic work-related activities." (D.E. 13-3, Page 16). Therefore, the ALJ considered Plaintiff's subjective complaints related to ailments when determining Plaintiff's RFC, limiting him to light work. Additionally, the ALJ appropriately discounted the check the box opinion of Nurse Practitioner Fitz who opined Plaintiff was unable to work when he noted that she "did not identify any supporting evidence to bolster her opinion and failed to assign the claimant any specific functional limitations." (D.E. 13-3, Page 16 and D.E. 13-12, Pages 38-39); *Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (quoting *Foster v. Astrue*,

410 F. App'x 831, 833 (5th Cir. 2011) (The Fifth Circuit has characterized responses to a questionnaire format as the "typical brief or conclusory testimony" that an ALJ may disregard when lacking "explanatory notes" or "supporting objective tests and examinations."); *Garcia v. Colvin*, 622 F. App'x 405, 409 (5th Cir. 2015) (An ALJ may place less weight, little weight, or even no weight on a report if statements are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence); *Greenspan*, 38 F.3d at 237 (citation omitted) (An ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.")

The undersigned also notes that while Plaintiff was incarcerated from 2014 to 2018 and was therefore unable to work in the national economy, he is noted to have routinely performed vigorous workouts while incarcerated, even while suffering from the ailments he now alleges are disabling and causing debilitating pain.  (D.E. 13-3, Page 37 and D.E. 13-9, Pages 27-28 and 30).  Additionally, although Plaintiff alleged a very limited activity level at the hearing, his daily activities, including cooking, cleaning, assisting in the care of his elderly parents, shopping, watching TV and doing laundry are not consistent with this testimony.  (D.E. 13-3, Pages 30-37; D.E. 13-6, Page 38; D.E. 13-13, Page 34; D.E. 13-17, Pages 5-9 and 50); *Leggett*, 67 F.3d at 565 n. 12.

Further, to obtain a remand for an ALJ's failure to develop the record, Plaintiff must demonstrate he was prejudiced by the deficiencies he alleges.  *Brock*, 84 F.3d at 728 (explaining Plaintiff "must show that he could and would have adduced evidence that might

have altered the result") (citation omitted).  Plaintiff has failed to make a sufficient showing of prejudice and points to no sufficient evidence that, had the ALJ developed the record further, would have been offered at the hearing and changed the result.  Plaintiff has not offered any evidence of prejudice.  The ALJ conducted a review of the entire record and used this information to determine Plaintiff's RFC.  The ALJ did not have a duty to request a consultative examination when the record already contained substantial evidence upon which to make a determination.

### C.     The Grid Rules

An impairment is exertional when it affects a person's ability to meet the strength demands of jobs, specifically the ability to sit, stand, walk, lift, carry, push and pull.  *Sykes v. Apfel*, 228 F.3d 259, 263 (5th Cir. 2000) (citing 20 C.F.R. § 404.1569a).  All other impairments are considered non-exertional.  *Id*.  "Use of the 'Grid Rules' is appropriate when it is established that a claimant suffers only from exertional impairments, or that the claimant's non-exertional impairments do not significantly affect his residual functional capacity."  *Crowley,* 197 F.3d at 199; *Loza v. Apfel,* 219 F.3d 378, 399 (5th Cir.2000) ("[I]f it should be determined on remand that [claimant's] non-exertional mental impairments during the period of disability were not merely a slight abnormality of minimal effect on ability to work, the ALJ's reliance on the Grid Rules at the fifth level also constitutes error and must be reconsidered.") (citations omitted).              Here, the ALJ relied on the Grid Rules, rather than the testimony of a VE, when determining jobs exists in significant numbers in the national economy that Plaintiff is able to perform.  (D.E. 13-3, Pages 16-

17).  Plaintiff argues the use of the Grid Rules was inappropriate because he has a non-exertional limitation, specifically pain caused by his headaches, which the ALJ found to be a severe impairment at Step Two.  (D.E. 28, Pages 16-19).  Plaintiff reasons the ALJ's determination at Step Two that Plaintiff's headaches are a severe impairment "implies that Chapa has non-exertional limitations," specifically pain, that are significant.  (D.E. 28, Pages 17-19).  Therefore, Plaintiff submits that "[t]he inconsistency between the ALJ's step 2 finding and the step 5 finding requires remand."  (D.E. 28, Page 19).  For the reasons discussed below, the undersigned finds Plaintiff's last ground for relief is also without merit.

There is a distinct difference between a Step Two severity finding and an RFC assessment.  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018).  A Step Two finding pursuant to the *Stone* standard requires only "a *de minimis* showing."  *Id.*  Further, a finding that a claimant's impairment is "severe" at Step Two does not necessarily mean the impairment will affect the RFC.  *Winston. v. Berryhill*, No. 3:16-cv-419-BH, 2017 WL 1196861, at *13 (N.D. Tex. Mar. 31, 2017), *aff'd*, 755 F. App'x 395 (5th Cir. 2018) ("The ALJ must clearly consider the severe impairments in determining the claimant's RFC, not necessarily assess limitations for each severe impairment."); *Sarah B. v. Berryhill*, No. 1:17-CV-0080-BL, 2018 WL 3763837, at *8 (N.D. Tex. June 29, 2018), *report and recommendation adopted*, No. 1:17-CV-080-C-BL, 2018 WL 3756944 (N.D. Tex. Aug. 8, 2018) ("[T]hat Step 2 only requires 'a *de minimis* showing' provides an apt reminder that

Case 6:21-cv-00015   Document 30   Filed on 03/14/22 in TXSD   Page 31 of 34

courts must vigilantly keep in mind the differences between an assessment of RFC and a Step 2 severity finding.") (internal citation omitted).

Here, in making the RFC assessment, the ALJ did not find Plaintiff's headaches significantly limited his ability to work. Rather, the ALJ found Plaintiff's "complaints of significant and debilitating headaches are not persuasive. However, I recognize that claimant's headaches, even if not disabling, do cause some type of limitations in his ability to function. In doing so, I limited him to the full range of light work." (D.E. 13-3, Page 15).[5] Therefore, the ALJ expressly considered Plaintiff's headaches, which he found to be Plaintiff's only severe impairment at Step Two, when assessing his RFC but, contrary to Plaintiff's assertion, explicitly discredited Plaintiff's alleged limiting effects, which would include pain. Rather, the ALJ determined the alleged limiting effects of Plaintiff's headaches did not significantly affect his RFC as he could perform a full range of light work. *Winston*, 2017 WL 1196861, at *14 ("[T]he ALJ considered the medical impairments from step two when she made her RFC determination and assessed Plaintiff's limitations based on their impact on her actual ability to do work. There is therefore no inconsistency between the ALJ's step two findings and her RFC determination.") This finding is supported by substantial evidence on the record for the reasons discussed above.

---

[5]While pain alone can be disabling, the pain must be constant, unremitting and wholly unresponsive to therapeutic treatment to be recognized as disabling under the Act. *Hames*, 707 F.2d at 166 (citations omitted). The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. *Id.* "Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity." *Id.* Substantial evidence supports the ALJ's decision that Plaintiff has not done so and Plaintiff provides no argument or sufficient evidence to the contrary.

Further, the undersigned recommends that on this record, there is no merit to Plaintiff's argument that the ALJ should have considered headache pain as a non-exertional limitation as the ALJ is entitled to discredit Plaintiff's testimony regarding the limitations caused by his conditions. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991)) (An ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record). "The ALJ must consider subjective evidence of pain, but it is within his discretion to determine pain's disabling nature." *Id.* The ALJ found Plaintiff's allegations, including his testimony regarding his pain and other symptoms, "was not consistent with the medical evidence of record and [was] not persuasive." (D.E. 13-3, Page 16). As the ALJ considered but discredited Plaintiff's claims, the ALJ determined Plaintiff's headache pain did not amount to a non-exertional impairment that significantly limited his capacity to perform a full range of light work as indicated by the Grids. *Crowley,* 197 F.3d at 199. Accordingly, the ALJ was not required to use VE testimony.

## VII.   CONCLUSION

For the reasons above, the undersigned **RECOMMENDS** the ALJ's decision is supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED** (D.E. 28), the Commissioner's Motion for Summary Judgment be **GRANTED** (D.E. 29) and this case be **DISMISSED**.

Respectfully submitted on March 14, 2022.

_Jason Libby_
Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).